**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | |
| | : | Crim. No. 07-091(HHK) |
| | : | |
| ADAM DEGROAT, | : | |
| Defendant | : | |

**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**

The defendant, Adam Degroat, through undersigned counsel, hereby submits the

following Memorandum in Aid of Sentencing.  The defendant concurs in the recommendation of

the Government as articulated in its Memorandum In Aid Of Sentencing, and respectfully

requests that that he be sentenced to a period of probation with the condition that he pay $7, 000

in restitution to Gateway Computers.

**I.     OFFENSE LEVEL CALCULATIONS AND RESTITUTION.**

1.  Consistent with his agreement with the United States, and the calculations of the

Probation Office, the defendant agrees that the Adjusted Offense Level is 12 (*PSI*, Paragraph

28).   After adjusting two levels for acceptance of responsibility, U.S.S.G. Sects. 3E1.1 (a), the

defendant's Total Offense Level (*PSI*, Paragraphs 30-31) is 10. Offense Level 10, Criminal

History Category I results in a U.S.S.G. Zone B sentencing range of 6 to 12 months.

2.  The United States calculated the amount of restitution that is attributable to the

defendant in this case as $7,000.  See 18 U.S.C. 3663 (a) (1) (A).  In his plea agreement, and

consistent with the Statement of Facts, the defendant agreed to the accuracy of this amount; the

Probation Office in the PSI also concurs that this amount constitutes the appropriate amount of

restitution.

**II**. **18 U.S.C. 3553(a) FACTORS; SUGGESTED SENTENCING PLAN**

3.  Clearly the defendant's offense conduct was in contrast to his otherwise laudable behavior as a responsible citizen, and he has demonstrated remorse for that aberration.  The defendant has virtually no criminal history and his criminal history level is I. (His only other contacts with the Criminal Justice System were for minor traffic infractions.)   While his misconduct here was serious, the defendant's role has been categorized by the investigating postal inspector, Marydith Newman, as minimal. *PSI* at Paragraph 17.  The prosecution concurs in this characterization of the defendant's role as minimal.  *Government's Memorandum in Aid of Sentencing* at 2.

4. The defendant demonstrated his acceptance of responsibility early in the criminal investigation by voluntarily providing a detailed statement to the postal inspectors. The defendant described to the inspectors how his supervisor in the shipping department at Gateway, Dwayne Simmons, initiated him into the computer theft scheme. He detailed the roles played by Simmons, by another supervisor and by other shipping clerks.

5.  After counsel was appointed, the defendant immediately expressed his desire to negotiate a plea agreement and to assist law enforcement.  The defendant shortly thereafter entered into a pre-indictment plea agreement in which he accepted full responsibility for his criminal activity. Thereafter, he met with the prosecutor and a postal agent and reiterated the inner workings of the conspiracy.  He also participated in a conference call with a Gateway supervisor and a law enforcement agent in which he confirmed the operational details of the shipping system at Gateway. He also provided additional details during his debriefing that assisted the Government in its successful prosecution of Charles Emor.

6.   The defendant has been employed steadily throughout his adult life. He is currently employed as a sales representative for Mobile Solutions in Virginia Beach, Virginia.  He previously held positions for Genco, Bank of America as a lead operations representative, and for Gateway.  After losing his position at Gateway, the defendant was sufficiently humbled to accept these other positions that paid him significantly less than did his long-term job at Gateway.

7.   The defendant lives with his father and his disabled brother, Mark Degroat. As Mark suffers from Neurofibromatosis, he is paralyzed and completely incapable of caring for himself. See Attachment, *Medical Records of Mark Degroat*; *PSI* at Paragraph 36. As a result, he needs assistance 24 hours per day. During the daytime hours, the defendant's father, William Degroat, cares for his disabled son, and then goes to work at night. The defendant, after returning from his job, then provides the necessary care for his brother at night, which includes assisting Mark with feeding, personal hygiene, and bathroom functions. There is no other family member available to participate in Mark's care, and the family lacks the financial resources to hire an outside health aide. It would therefore create a great hardship for his brother and the rest of the family if the defendant were to be incarcerated and unavailable to care for his brother.

8.   The federal courts, even in the pre-Booker era, United States v. Booker, 543 U.S. 220 (2005), recognized that family circumstances may constitute an appropriate basis to sentence an offender below the otherwise applicable guideline range, especially where the defendant maintained a more than fungible relationship with an ill family member. See United States v. Alba, 933 F.2d 1117, 1122 (2d Cir.1991) (upholding departure where defendant lived with disabled father who depended on defendant to assist him moving in and out of wheelchair); United States v. Haversat, 22 F.3d 790, 797-98 (8th Cir.1994) (defendant's care was

irreplaceable element of treatment for mentally ill spouse); <u>United States v. Sclamo,</u> 997 F.2d

970, 972-74 (1st Cir.1993) (defendant had special relationship with child with psychological

and behavioral problems).

9.  In <u>United States v. Dominguez</u>, 296 F. 3d 192, 199-200 (3d Cir. 2002), a pre-*Booker*

case, the Third Circuit remanded for re-sentencing; the trial court therein had based its failure to

depart on its mistaken interpretation that under the Guidelines, it lacked the authority to do so

based upon a defendant's family circumstances.   The Court in <u>Dominguez</u>, a banking fraud case,

advised the trial court that the latter could exercise its discretion to grant a downward departure

to a non-imprisonment sentence on remand, despite the then mandatory character of the

Guidelines:  "Having now clarified our jurisprudence, we observe that in this case such a

downward departure would be within the District Court's discretion given its findings regarding

Dominguez's extraordinary family needs and the absence of any other readily available source of

meeting those needs. Dominguez has been terminated from her banking position and poses no

threat to society, so, incapacitation appears unjustified. She has lost her employment and her

reputation, and hurt and humiliated her parents, all for no gain, and hence, her punishment will

have a significant deterrent effect.  …  Finally, as Dominguez is a contrite and educated woman

with no past criminal history, and has received mental health counseling, the trial court may

conclude that incarceration would serve no rehabilitative purpose. In sum, the District Court

would be well within its discretion in determining that none of the purposes underlying the

Guidelines would be disserved by reducing Dominguez's sentence."

10.   Prior to the Supreme Court's mandate in *Booker*, under the Guidelines courts were

discouraged from taking family circumstances into account in imposing sentence, see <u>U.S.S.G. §</u>

<u>5H1.6</u>.  After *Booker,* however, the fact that a factor is discouraged (or even forbidden) under the

Guidelines does not make it irrelevant when a court is weighing statutory factors apart from the Guidelines. United States v. Aitoro, 446 f.3d 246, 255 (1ˢᵗ Cir. 2006). Consistent with the dictates of Booker, "[A] district court's mandate is to impose 'a sentence sufficient, but not greater than necessary, to comply with the purposes of section 3553(a)(2). Reasonableness is the appellate standard of review in judging whether a district court has accomplished its task." United States v. Collington, 461 F. 3d 805, 807 (6ᵗʰ Cir. 2006), quoting United States v. Foreman, 436 F.3d 638, 644 n. 1 (6th Cir.2006) (emphasis in original). (trial court's sentence of mandatory minimum sentence of 120 months in drug trafficking and firearms case where guidelines called for 168-210 months upheld as reasonable in light of family history and other factors.)    A district court is permitted to vary from the guidelines in order to impose a sentence that fits the mandate of Section 3553(a). Id.  In fact, as our Circuit has recently emphasized,

 "…. A sentencing judge cannot simply presume that a Guidelines sentence is the correct sentence.  To do so would be to take a large step in the direction of returning to the pre-*Booker* regime.  (Citations omitted).  Another approach, the correct one in our view, is to evaluate how well the applicable Guideline effectuates the purposes of sentencing enumerated in § 3553(a)." United States v. Pickett, 475 F. 3d 1347, 1353  (D.C. Cir. 2007).

        11.  Accordingly district courts now have the discretion to weigh a multitude of mitigating and aggravating factors that existed at the time of mandatory Guidelines sentencing, but were deemed not ordinarily relevant, such as age, education and vocational skills, mental and emotional conditions, employment record, and family ties and responsibilities. United States v. Husein, 478 F. 3d 318 (6ᵗʰ Cir. 2007).    There is of course no mathematical formula that limits the extent of the variance, as "… the very nature of individualized sentencing makes it difficult for (an appellate) court reviewing a well-reasoned decision by a district court with day-to-day

expertise in sentencing to conclude that a sentence is unreasonable merely by looking at the extent of the variance." United States v. Cherry, 487 F. 3d 366, 373 (6th Cir. 2007).

12.  In United States v. Husein, supra, a narcotics distribution case that presented family circumstances similar to those of Mr. Degroat, the Sixth Circuit recently upheld a departure and a variance to a sentence of supervised release from a Guideline sentence at Offense Level 21 (37 –46 months), based largely upon the defendant's familial situation.  In rejecting the government's arguments that it was improper for the trial judge to have ordered such a reduced sentence, since other adult relatives were available to care for the defendant's gravely ill father, the Court noted:  "But the mere existence of potential alternative sources of assistance or care is not sufficient to undermine a claim of irreplaceability. Instead, as the wording of the Guidelines makes clear, the alternatives must also be "reasonably available," which has been understood to mean "feasible" and "relatively comparable" to the defendant. " Id. at 327; See United States v. Roselli, 366 F.3d 58 (1st Cir. 2004) (despite presence of other relatives, downward departure appropriate for father who along with his wife cared for two children afflicted with Cystic Fibrosis).

13.  Here there are no other available family members who could possibly step up to assist in the care of Mark Degroat. Nor is the variance sought in the least extreme, as even under the Guidelines the defendant would be eligible for a six-month sentence to be served on home confinement.  Significantly, the Government is in agreement that a sentence of probation is the correct one, especially in light of Mr. Degroat's cooperation and assistance in the prosecution of wrongdoers who played a greater role in the conspiracy than the defendant.

14.  The defendant was terminated from his shipping position at Gateway in 2003, about four years ago.   He has since demonstrated through his current employment-- and at other interim positions where he was a reliable and honest employee-- that he poses no threat to

society, so incapacitation is unnecessary.   He is painfully aware how he has disgraced his

family, and the nature of the criminal proceedings against him and his felony conviction will

therefore have a significant deterrent effect.  Mr. Degroat is extremely contrite and has no past

criminal history. See United States v. Gaskill, 991 F.2d 82, 86 (3d Cir.1993) (factors warranting

departure to non-custodial sentence for credit fraud defendant with disabled spouse included "the

lack of any end to be served by imprisonment other than punishment" and "the lack of any threat

to the community-- indeed, the benefit to it by allowing the defendant to care for his ailing

wife.")   As such, consistent with the factors enumerated at 18 U.S.C. 3553 (a) and with the

concurrence of the Government, the defendant urges the Court to sentence him to a period of

probation conditioned upon his payment of  $7, 000 in restitution to Gateway Computers,

payable in reasonable installments consistent with the defendant's income,


                         Respectfully submitted,


_____

Mitchell M. Seltzer,
D.C. Bar #261933
717 D Street, NW, #310
Washington, D.C. 20004
(202) 347-2333
Attorney for Adam Degroat

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Memorandum In Aid Of Sentencing was

served electronically upon Tejpal S. Chawla, A.U.S.A., United States Attorney's Office, 555

Fourth Street, NW, this 23d day of October 2007.


_____

# SENTARA.

Sentara Careplex Emergency Department
3000 Coliseum Drive
Hampton, VA, 23666
Phone: 757-736-2010

**Visit on: 9/15/07**

## Degroat, Mark W (40248055)

The Sentara Emergency Department would like to thank you for allowing us to assist you with your healthcare needs. The following includes patient education materials and information regarding your injury or illness.

1. The examination and treatment you have received in the Emergency Department has been rendered on an emergency basis. It is important that you notify your physician of new or continuing problems, since it is impossible to recognize and treat all elements of an injury or illness in a single Emergency Department visit.

2. Follow-up care, continued treatment, rechecks and/or additional medications are to be provided by your private physician.

3. Call your doctor or return to the Emergency Department if you feel worse or you feel no better in 48 hours.

4. X-ray and EKG readings are emergency readings only and final interpretations will be made by a Radiologist or Cardiologist.

5. I authorize Sentara Hospitals to release a copy of my Emergency Treatment Record to my physician for follow-up care.

6. Call 1-800-SENTARA for assistance and information regarding physician referrals.

**"None"**

| Follow-up With | Details | Comments | Contact Info |
|---|---|---|---|
| Thaddeus Sutton | In 2 days | | Tidewater Integrated Medical Svs. 2115 Executive Dr Ste 4b Hampton, Virginia 23666 757-838-2891 |
| SCPH ED | | As needed if symptoms worsen | 3000 Coliseum Drive Hampton, Virginia 23666 757-736-2010 |

**Additional Instructions**

See Dr Sutton on Monday - be sure to call for an appointment. Keep head of bed elevated for comfort. Return for worsening symptoms, fevers, and or chills.

**Discharge Attachments**

- Pleural Effusion-EI
- Neurofibromatosis



**SENTARA.**

## Certification of Attending Physician
### (must be completed by attending physician)

| Physician's Name | Degree/Specialty |
|---|---|
| Dr. Anthony Sibley | Urology |
| **Practice Name** | **Address** |
| Dr. Anthony Sibley | 2204 Executive Drive #B |
| **Phone Number** | **Fax Number** |
| (757) 838-1100 | (757) 838-3089 |

1) The patient on the reverse side of this form is presently under my care:
   ___✓___ Yes  _____ No

2) Date dependent was last treated: __12|3|03__

3) Diagnosis and concurrent conditions: __Neurogenic Bladder & Neurofibromatosis__
   __tosis__

4) Has such disability existed continuously since before dependent attained age 19?
   ___✓___ Yes  _____ No

5) Has the dependent been confined to a hospital as a result of this disability?
   _____ Yes  ___✓___ No

6) Is this dependent presently incapable of self-sustaining employment by reason of:
   Mental Retardation?          Physical Handicap?          Mental Handicap?
   ☐ Yes  ☑ No                  ☑ Yes  ☐ No                 ☐ Yes  ☑ No

7) Prognosis:

   Is dependent totally disabled and incapable of self-support?
   ___✓___ Yes  _____ No
   If not totally disabled, is dependent capable of self-support?
   _____ Yes  ___✓___ No
   Do you expect a fundamental or marked change in the dependent's condition in the future?
   _____ Yes  ___✓___ No
   If yes, when will the patient recover sufficiently to be capable of self support?_____

8) Additional Remarks:

_____

Physician's Signature _____    Date Signed __3|30|04__

# Neurofibromatosis

The neurofibromatoses are genetic disorders of the nervous system that primarily affect the development and growth of *neural* (nerve) cell tissues. These disorders cause tumors to grow on nerves and produce other abnormalities such as skin changes and bone deformities. Although many affected persons inherit the disorder, between 30 and 50 percent of new cases arise spontaneously through *mutation* (change) in an individual's genes. Once this change has taken place, the mutant gene can be passed on to succeeding generations. Scientists have classified the disorders as neurofibromatosis type 1 (NF1) and neurofibromatosis type 2 (NF2). NF1 is the more common type of the neurofibromatoses. In diagnosing NF1, a physician looks for changes in skin appearance, tumors, or bone abnormalities, and/or a parent, sibling, or chil with NF1. Symptoms of NF1, particularly those on the skin, are often evident at birth or during infancy and almost always by the time a child is about 10 years old. NF2 is less common. NF2 is characterized by bilateral (occurring on both sides of the body) tumors on the eighth cranial nerve. The tumors cause pressure damage to neighboring nerves. To determine whether an individual has NF2, a physician looks for bilateral eighth nerve tumors and similar signs and symptoms in a parent, sibling, or child. Affected individuals may notice hearing loss as early as the teen years. Other early symptoms may include tinnitus (ringing noise in the ear) and poor balance. Headache, facial pain, or facial numbness, caused by pressure from the tumors, may also occur.

TREATMENT

Treatments for both NF1 and NF2 are presently aimed at controlling symptoms. Surgery can help some NF1 bone malformations and remove painful or disfiguring tumors; however, there is a chance that the tumors may grow back and in greater numbers. In the rare instances when tumors become malignant (3 to 5 percent of all cases), treatment may include surgery, radiation, or chemotherapy. For NF2, improved diagnostic technologies, such as MRI, can reveal tumors as small as a few millimeters in diameter, thus allowing early treatment. Surgery to remove tumors completely is one option but may result in hearing loss. Other options include partial removal of tumors, radiation, and if the tumors are not progressing rapidly, the conservative approach of watchful waiting. Genetic testing is available for families with documented cases of NF1 and NF2. New (spontaneous) mutations cannot be confirmed genetically. Prenatal diagnosis of familial NF1 or NF2 is also possible utilizing amniocentesis or chorionic villus sampling procedures.

WHAT WILL HAPPEN

In most cases, sympton s of NF1 are mild, and patients live normal and productive lives. In some cases, however, NF1 can be s verely debilitating. In some cases of NF2, the damage to nearby vital structures, such as other cranial nerves and the brainstem, can be life-threatening.

RESEARCH BEING DONE

Several years ago, research teams located the exact position of the NF1 gene on chromosome 17. The product of the NF1 gene is a large and complex protein called neurofibromin. One portion of this protein is similar to a family of proteins called GAP (guanosine triphosphatase-activating protein). Scientists have demonstrated that GAP proteins play a significant role in tumor suppression in certain cancers. The similarity of the NF1 protein to GAP proteins suggests that the NF1 protein may have a similar switching role in the development of neurofibromas. Scientists theorize that defects in the gene may lessen or inhibit the normal output of its protein and allow the irregular cell growth that may lead to tumor development. Intensive efforts have led to the identification of the NF2 gene on chromosome 22. The NF2 gene product is a tumor suppressor protein. Basic studies in molecular genetics may lead one day to nonsurgical or pharmacologic treatments aimed at retarding or suppressing tumors associated with the neurofibromatoses. The Interinstitute Medical Genetics Research Program at the NIH Clinical Center conducts NF2 family history research. Using specimens from some of the families, scientists have isolated and sequenced the NF2 gene and have described two different patterns of clinical features in NF2 patients. Investigators are continuing to study these patterns to see if they correspond to specific types of gene mutations.

Case 1:07-cr-00091-HHK    Document 13-2     Filed 10/23/2007     Page 4 of 5

**Research is continually being done to learn more about this problem.**
Provided by: The National Institute of Neurological Disorders and Stroke

ExitCare® Patient Information ©2006 MedQuest, LLC.

# Pleural Effusion

You have a pleural effusion. This means you have fluid in the space between your lung and your chest wall. This condition may result from many different problems including:
- Pleurisy or inflammation of the lining of the lung.
- Lung infections such as pneumonia.
- Blood clots, heart disease, chest injuries, cancer, and other medical problems.

**A pleural effusion may not cause any symptoms. If it is large, however, it can make you short of breath**. Other symptoms include cough, chest pain, or fever. The diagnosis of a pleural effusion is most often made by chest x-ray, CT, or ultrasound studies. A sample of the fluid can be taken using local anesthetic and a needle or catheter placed between the ribs. This procedure may be needed to determine the cause of the effusion, or to treat a large effusion.

Treatment is specific to the cause, such as antibiotics for infections. Mild pain or anti-inflammatory medicines may be helpful in relieving symptoms. Chronic effusions often have to be periodically drained. It is very important that you see your doctor or a specialist to be sure the effusion is not from a serious medical condition. A follow-up chest x-ray is usually needed.

**SEEK IMMEDIATE MEDICAL CARE IF YOU DEVELOP:**

Shortness of breath                    Increased pain                    A high fever

**ExitCare® Patient Information ©2006 MedQuest, LLC.**